Case No. 15-1009 Petro Star Inc. Petitioner v. FEDERAL ENERGY REGULATORY COMMISSION, et al. Ms. Citron for the petitioner, Ms. Chu for the respondent, and Mr. Bender-Nagel for the intervenors. Mr. Bender-Nagel. Mr. Citron, please. May it please the Court, Eric Citron for Petitioner Petro Star. The minimum the APA required of the FERC in this proceeding was to provide some rational explanation for how the Quality Bank could be functioning correctly according to its premises, and yet value all of the components of a barrel of oil as somehow less valuable than the barrel itself for three years running. And we've explained at length that that result is inconsistent with the fundamental premises of the Quality Bank. The basic problem is that although FERC didn't have to design the Quality Bank to rely on it, it did. It uses the actual market prices for the six marketable cuts and then tries to synthesize actual market prices that would be commensurate for the non-market cuts. And once it's designed it that way, the only way the nine cuts can all be worth less together than a raw barrel is if the distillation that the Quality Bank relies on somehow removes value from a barrel of oil. The ALJ, supported by the Commission, certainly gave one explanation. Your whole case relies on your assumption about the validity of your theory that the less-than-a-barrel anomaly really is an anomaly. Now, both the ALJ and the Commission say there is no anomaly here because there are considerations that would cause what you're suggesting. The ALJ says, since the hypothetical Quality Bank refinery does not incorporate any of the advanced processing equipment, a real-world refinery would include. The Quality Bank valuation couldn't possibly reflect the Alaska North Slope Common Stream market value plan attempts to estimate. I mean, that's the part of it. As soon as you read this case, that's the one piece of it you're not addressing. We don't really understand the inputs on the other side. So you could have exactly what you call an anomaly. I don't know why that's so strange. It could happen, especially during the period, this depressed period that occurred. So it actually doesn't make sense that that would be true, and this is actually absolutely critical to our case. The six marketable cuts are actual market prices for the intermediate products that come out of distillation before final finishing. Everybody agrees about that. The three non-market cuts, the Quality Bank attempts to synthesize the value of those cuts by working backwards, but they're supposed to be commensurate. They're supposed to be nine market values, and they're supposed to be after the first step, where they're initially refined from raw crude into distilled crude and then to finished products. And there's no way they're going to lose value. But there's more to be done with respect to the three disputed cuts. That wouldn't be right. There's more to be done. There's more processing to be done. We've got to take account of that. For sure there's more to be done. For which you need to have equipment. For which you would need to have equipment, absolutely. The thing is that equipment raises the value, having that equipment raises the value of the underlying inputs, because you can make valuable stuff out of it. That's actually our point, that it would raise the value of the distilled product, the intermediate product, and that the Quality Bank isn't doing that enough. It's not actually reflecting the increased value of those intermediate components. And I just want to point out, this isn't actually, although the ALJ later says that point, my proposition that the intermediate products are worth more than the raw crude, it's not even actually disputed. The ALJ says the presumption of the Quality Bank is that the intermediate products reflect the cost of doing the initial distillation. And there's no dispute that initial distillation is the first step in every single refinery. But what do we do with the language that Judge Edwards pointed to, because that's the same language that I was fixated on in paragraph 136, which is on JA 451. Because I think a lot of the force of your submission is that, look at your own decisions, you have Tesoro, at least we need to get some kind of response to a facially plausible argument. And you rely a great deal on this, a certain anomaly. And at least this language reads to me as a response. And now, it may not be one that you think is satisfactory, but it seems different to say that there's no response, and therefore you need to remand to give a reasoned explanation, as opposed to saying there is a response, but it's not altogether persuasive. So I want to say a few different things about it. The first is, it's a one-sentence response to what is obviously— Now, that doesn't matter. I mean, I think what we need is some explanation with precision— I understood it. I mean, I understood what they're saying, but it's also— No, no, no, that can't be your argument. You've got to have better than that serious— Fair enough. The real problem is that it's inconsistent with what the ALJ says in other places of his own opinion. And that makes it very hard to understand what he means. As I said, there is a footnote where he says that you actually expect—this is on JA396. He says, it is assumed that the published market price for each of the six cuts includes the simple refining cost of producing the cut. It is assumed. Well, that's an assumption— But the board later said, the commission later says, we're just looking to do the best we can relatively. We can't guarantee you that this is going to be absolutely right at every moment. I mean, that's what they're really saying. You're talking as if there is a number in the sky, all you have to do is reach and grab it, and it's all done. And they're saying, no, that's not the way it works. And there's another problem you're going to have to address in all of this, because it takes in your whole sunk cost argument, which I find very perplexing. This has been going on a long time. And I don't understand what the new arguments are. This has all been here for a long time. And so you need to incorporate that in your answer, because I really want you to understand that part I don't get at all. Where are you coming from? This has been here for a long, long time. I'd like to address that, and I want to just put a pin in it for one second, because I also want to be really clear about the inconsistencies surrounding the point that we were discussing a moment ago. Go ahead. And so one of the inconsistencies is this point on JA396, that it's assumed that the distilled products, the intermediate products, reflect the additional cost of distillation. That is a built-in premise of the quality bank, and this result is inconsistent with the premise. That's problematic. The model should not reach results that are inconsistent with its own premises. But they're saying that's not so. They're saying you can have fluctuations in certain periods, and now the model looks like what you say it should look like, right? It changed back again. That's true. See, I just want you to understand. I read. I said, yeah, well, that's a perfectly fair explanation. Going through different economic periods, no, we may not always achieve exactly what you're saying. There may be some slides, but now we're back again. And, again, this has been going on for a long time. It's never been challenged. It's an assumption and not a guarantee. That may be so. If the suggestion is that there was a three-year period of time where distillation, contrary to the testimony of their own experts at 287, JA287, was removing value from a barrel of oil, not unprofitable, actually taking value out somehow, doing the initial. I would like to see some evidence, some explanation for why that was so. Well, there's nothing like that in the commission's opinion, so it's very hard for us to respond, engage in dialogue, try to figure out what the commission actually thinks is going on. There is a sentence that says, you know, it's possible that that's what was happening, but without any evidence to point to and without any way of understanding that, that just doesn't cut it, I think, from the APA statement. And the sentence you're talking about is the one that starts, since the hypothetical quality bank? Yeah. Okay. And you said there were other inconsistencies besides the footnote? Well, the inconsistency, which we discussed in our brief, is a little complicated, but the ALJ actually recognizes that you can compare the calculated QB value for resid to the real-world value of resid as a blend stock for oil. He says that comparison, I reject their view that that comparison is inappropriate. That comparison is appropriate, but I'm going to reject the result for other reasons. But recognizing that that comparison is appropriate is exactly our point, that the way the quality bank actually functions is that it's supposed to calculate real-world values for the nine cuts and that the nine cuts together should therefore add up to more than a barrel of oil. If you agree with that premise, which he then does for the blend stock argument, you can't actually make the argument he's making before, which is that you would do not expect the nine to add up to the value of a barrel of oil. I think those inconsistencies indicate that FERC actually doesn't have a solid theory for what it thinks is going on with the anomaly. And I do think that this sort of half-hearted explanation... And is that still what you think is a Tesoro problem? Yes, I think that is a Tesoro problem. And I want to return to your point that this has been going on for a long time, because this case actually is, if you go back and look at the briefing in Tesoro, a complete redux of Tesoro. What happened in Tesoro was this. Several years into the distillation method, Exxon came back and said, look, we've looked at a bunch of real-world data. We've compared the way that the distillation method would value various crude streams all over the West Coast. And the numbers aren't adding up. It looks like the distillation method doesn't work. So we want to go back to the gravity method or something like it. And FERC said, look, we don't have to do that. We've already concluded that the gravity method is unjust and unreasonable. So we're not going back to it. And then Exxon came to this court and said, look, before we discuss whether our proposed solution is just and reasonable, before we discuss how long this has been going on, FERC owes us an explanation for what it thinks is going on with the data that we provided. And that's exactly what Judge Williams' decision says FERC had to provide. They had to explain, before we start talking about how long it's been going on or anything like that, why it is that the data that Exxon provided to the FERC was not actually problematic. And that's what we want here. I'm not trying to get this court to tell FERC exactly how the quality bench should work. We really just want to understand what FERC thinks is going on with the less-than-a-barrel anomaly so we know how to respond to it. It may actually not be the case that we're right about capital costs being zero. Maybe it should be something else. Maybe it's that plus other things. Also an issue in this proceeding was what exactly you can make out of RISD and how valuable it would be. Yeah, but the thing is you still haven't responded to what you call the one-sentence answer because that is an answer. I don't think it is. And they've returned the market as now the figures coming from the market are now doing what you say they ought to be doing. Why is that? Why did they switch back after the three-year period? Well, they certainly do fluctuate. They've also gone back since they went back. That's all we're saying, right? That's all they're saying. There is some fluctuation, and it may be for precisely the reasons stated in the one-sentence. I don't need a one-to-one sentence to understand that. No, so actually I don't think— In other words, in terms of judicial review. I'm not talking about what the right answer should be, but in terms of review. I mean, I understand what they're saying here. I understand what they're saying, too. There's two problems with it. One is they are not saying, actually, we think the quality bank is extraordinarily inaccurate. And over periods of time, it will dip to theoretically impossible prices. But that's okay. It's just a rough cut. You know, we're not doing it perfectly. This is what we want. It's okay that it's inaccurate. If that's their argument, I want to see the commission say that. Because maybe we can propose a better solution that doesn't have that problem. But apart from that, that one sentence— But that's what the commission said. The methodology is not to determine the actual market values of the cuts or strains, but to assign accurate relative values among the various cuts. So that proposition is false. That is not rational. And this is our main point. Because it says the goal of the quality bank is not to assign accurate values. That is absolutely and incontrovertibly false. It doesn't have to be. But false, you don't mean that it's actually false in some organic abstract way. You're just saying it's inconsistent with their own notion of the pricing model, which is that it's supposed to be based on market conditions and not based on relativeness alone. Well, that's exactly right. What it says is the goal— I suppose it's true that the goal is not to assign accurate market values, but for deciding to use actual market values and having adopted that view that there will be accurate market values. This result is totally unexpected. And to see it for three years is genuinely baffling. It's not like this is some short-run economic— Maybe you're missing something, but when you say actual market values, you're drawing from different sources, and the one sentence that you keep rejecting is suggesting, yeah, we're drawing from the source that everyone agrees we should, but at certain times the input from that one source may cause the problem that you're now— So actual is not actual in the sense that we can guarantee anything. They're saying you're not opposing them going to the source for the quote-unquote actual market figure, but that actual market figure may be inaccurate in any given moment. It is accurate only in the sense that we all say, well, that's actual market, but stated market figures are not absolutely accurate at all moments in time. They're the best we can do at any given moment in time, right? I agree with that. Here's what I want to say, and it's two separate points. One is, as your opinion in Blue Water points out, what we need from the agency is an explanation of what they think is going on with precision, because unless we have that precision, we don't understand what FERC's position is going forward. Well, I thought you just told me you understood the sentence, too. We all understand what it means, so what more do we require? Well, I don't understand it to mean what you just said. Oh, I thought you said you and I both understood. Well, maybe we don't understand it to say where, which I think is indicative of the problem. You know, there's a lot of ways to read one sentence. What I think they think is going on is that if you— that they're saying actually maybe they don't all have to add up to more than a barrel. You wouldn't hypothesize that. But if you look at the evidence that they point to, again, this is on JA-287, their expert says presumably distillation adds value. And the ALJ says the premise of the quality bank is that distillation prices will reflect the price of— or the cost of doing the distillation. If those premises are not true, I want FERC to say actually they're not all true, and that's a problem because I need to know exactly how they propose to address it. But, you know, apart from that, even that suggestion relies on a confusion between cost and value. There's really no way that the first step in the refining process at every single refinery, which is what we agree distillation is, is going to somehow make a raw barrel of crude less valuable. There's nothing else you can do with crude other than refine it. If you could have the nine cuts already made better, it would be very strange for them to lose value, and not just for very short run periods, but three years running. Can I ask you one question about your argument, which is that suppose just bear with me in the assumption that we disagree with you on whether this one sentence is an adequate response to your point about the anomaly, the pricing anomaly. You've got some other arguments to the effect that there were things raised, like the linear programming models, if I'm using the term, the correct term, that should have generated a response, but as to which we don't see a response in the ALJ's opinion or the FERC order. Does the presumed answer in the one sentence vis-a-vis the pricing anomaly address the linear program, or is that just an independent argument as far as you're concerned? I mean, there are two separate points we want to take. One extremely important point, which I really do still want to know exactly what the agency's position is, is what's wrong, what's going on with that anomaly, how could that be true for three years? Apart from that, we suggested that as a matter of basic economic theory, you would not expect capital costs to be included in the resid valuation because the other prices are short run market clearing prices. I guess I wasn't quite clear that that was a matter of basic economic theory as much as it was a matter of economic reality in the sense that if you look at what actually goes on, capital prices aren't taken into account because it's short-term market pricing that doesn't take into account the capital expenses. Yeah, I think this is one of those happy situations where economic theory and economic reality actually intersect. But yes, our point is both that no one is reaping anywhere close to a 20% capital return in the market and the other prices are actually functioning as short-run prices. That's exactly what they are, not by hypothesis, but as designed by the quality bank. And so if those are short-run prices, in order to create- That's as to which there's a real market, that there's a functioning market. Yeah, there are functioning spot markets that are short-run. And in fact, that's why you get the fluctuations that you get, right? Those can go up and down. Now, as to that, your argument is this is also a tesoro problem. We raise these issues and we don't see a response, and the court should remand to give the agency an opportunity to hazard a response. That's exactly right. And my question is this. Is the response a conceptual one? In other words, is the response one that's already embedded within the fabric of what the ALJ said and what the commission signed on to, to the effect that, well, yes, there is a distinction between the six and the three because as to the six, of course we're dealing with short-term market responses because the long-term investments have already been made. As to the three, the long-term investments are something that we have to work into the formula because they're not something that otherwise exists. Yeah, I mean, I guess I struggle with the idea that, like, the correct conceptual response is embedded in the agency's answer. I think the APA requires a little bit more than that from the agency. But apart from that, I think it's also problematic that what they're going to say is that this relies on we want to build in investment because there is also investment necessary to do the other forms of refining. You can't ignore it for the short-run prices for the six and include it for the three without creating an oxy problem, which is that these actually aren't commensurate values. One of them is sufficient to sustain long-run investment. The other is not. That would be the answer. Isn't this really, I mean, I read those four points that you added, and I went back and looked at the ALJs, the transcript. I really didn't see all of those points being raised with any clarity until you wrote exceptions. So it was like you had a lot of testimony being offered, and then you came up with some exceptions. Now, I thought the fourth exception subsumed the preceding three. It's essentially a sunk cost argument, and the Commission surely answered that, your sunk cost argument. Whether you agree with it or not, they answered it. Specifically, the ALJ did, as did the Commission, as did your expert. When firms are building cokers, there's a demand for new cokers. This would explain why the ALJ and the Commission, your expert was not disagreeing with that, that the capital cost deduction was appropriate under those conditions, and the ALJ and the Commission tried to show those were the conditions that were existing. Now, the preceding three to me are just blah, blah, blah. And I could not figure what they were in real case terms. My instinct, just so you understand, I would never send three things like that back, which are theoretical concepts, which have nothing to do that I can understand with the real case argument, which is sunk cost. The sunk cost argument was raised and answered by the Commission specifically, and I don't know why it's wrong. So two things. One is that FERC does not say you didn't argue this below, so we're rejecting these exceptions, which is what you would have to – they would have had to say that in order for this – No, no, no, no. Hear what I'm saying as a judge now. I'm saying I reviewed those four very carefully. So you're right. I may be seeing more than the Commission stated. But in my mind, it's only number four that's really in play. The other three are icing on the birthday cake. But four is really the issue. It's your sunk cost theory, which is what they're getting at and they got at. They answered it. Yeah. I'm not sure exactly what FERC's answer to the sunk cost theory is. That's interesting. You know, they say that these cokers appear to be reaping profits. But we say, look, even whether they're reaping profits or not, we have a short-run market price that doesn't include a guaranteed – Your expert said the capital cost deduction is appropriate under certain circumstances. That FERC say exists. Your expert. Yeah, I don't see how they can say that those conditions exist. That is, everybody is refining profitably. And yet say there was a three-year period where the distillation was actually removing –  It doesn't come back to the anomaly. It's a question of consistency in the FERC's explanation. What they're saying is, no, there wasn't a period where this was declining so precipitously that there wasn't demand and everybody was refining unprofitably. That didn't actually happen. By the way, that might be the only explanation that we're going to offer for why, over an extended period of time, all the internal cuts in a barrel of oil are somehow worth less than the barrel itself. These things have to make sense together in order to affirm the Commission's reasoning. I think what we're going to do, if we go down the unfortunate route of affirming the Commission based on its very brief explanation, or the ALJ – the ALJ is one sentence not endorsed by the Commission – that that was what was going on, and then use a very similar form but opposite form of analysis to deal with the sunk cost issue, is we're not actually going to test the internal consistency of the agency's position. And I think that's the one thing about it. Last thing before the – because I think it's – I raised it a long time ago. I'm just curious to hear your answer. Again, this is old news. This framework has been in existence for a long time, and generally we don't revisit things merely – because part of your second argument is fundamentally this has just been wrong all along. If I see that proposition not to me raises the problem we face in review of administrative law, it may or may not be true, but it's here. What's new now? I never did like it. We don't allow people to come in and say, I never did like that thing you created. You're smiling because you understand. And so I've got to find a way to get back to you, and so I'm coming back now. I've always hated it. It was wrong in 2005, even when there was no anomaly. Well, I don't know how you are here making that argument. I apologize for it, but it's really – it's Judge Williams and Judge Tatel's fault because this is exactly what DeSoto says you can do. Several years into the distillation method, Exxon looked at the data. And the distillation method order had specifically rejected what Exxon wanted. Exxon looked at the data and said, look, this data doesn't add up. You now need to give us an answer, and our proposal is to go back to the old method, even though the new one has been in place for several years. And the court said, what FERC has to do is, even if it's going to reject Exxon's proposed alternative, the FERC has to give a reasoned, intelligible understanding. It can't be that easy. It may be that if the agency chooses to respond, it's reviewable. That would fit with that law principle. There's several things going on here. But, you know, see, one possibility is the agency could say, in a case that's at least theoretically under Ed Law, we're not listening to this. So there are three, actually, things that are specific to this case that wouldn't require you to endorse anything like that broader principle, even though I think it's right. One is the agency initiated this hearing itself. This is the agency's own hearing. So it's very weird for them to say, you know, it's been too long. That's your answer. That's got to be the one we're answering. I have others, but I'll stick with that one. I mean, that's a narrow answer. Yes, it is. Because you're saying a broad proposition that, in my mind, is too broad. There's also a strong materiality requirement that's announced. I mean, your view is the agency took it upon itself to look at this anew, and having done that, they have to do the job that they're doing. I mean, this is their hearing. That's different. We're trying to help them reach the right answer. Now you're in safer territory. Notwithstanding what Judge Williams and Judge Tatum may or may not have said, I don't think they disagree with what we're saying. All right, fair enough. This is their hearing. They wanted to figure it out. We actually tried to help them. And we said we have this really serious anomaly in the data that is theoretically inconsistent with the premises of the Quality Bank. I really don't understand what they think is going on. And I think we need to before we can move forward. Thank you.  Ms. June. Thank you, Your Honor. May it please the Court, Susanna Chu for the Federal Energy Regulatory Commission. Your Honors, the agency orders on review fully responded to Petrostar's arguments. It's true the commission called this hearing to hear all of Flint Hill's and Petrostar's evidence on why they believe the COCR capital investment factor should be removed from the RISD valuation. The commission fully heard all of the arguments and fully addressed all of them. On the issue of the less than a barrel argument. The so-called anomaly. The so-called anomaly, correct. As a preliminary matter, I want to explain, in addition to this one-sentence answer, which I believe is how it was described. First of all, the so-called anomaly was not probative on the issue of whether the RISD formula should factor in COCR capital costs. And that's because there's direct evidence in the record demonstrating that refiners were earning profits throughout the entire period that was at issue in this hearing. And in particular, Flint Hills's witness conceded that this was so. Where did the commission say it's not probative? I mean, I understand what you're arguing, but again, this is about what the commission said. Where did they say that? In the initial decision at paragraph 144, joint appendix 455 to 56, the commission says that refiners were earning profits throughout this time period. And also, the commission cites Mr. Verlager's testimony. Mr. Verlager was the expert put forth by Flint Hills. And his testimony appears at JA 351 through 52. And in that testimony, Mr. Verlager acknowledges that market prices used by the West Coast refineries include the recovery of capital, fixed, and variable costs. So I thought this was a response to the argument on the rural conditions of the West Coast, right?  Isn't that what this is addressing? Right. Well, this fully addressed the sunk cost argument. And it also explains, it shows why the less-than-a-barrel anomaly is not probative. It's simply not a meaningful piece of evidence. And it wasn't probative on the issue of whether it should actually factor in the COCA costs or not. I mean, I guess the question is what Judge Edwards was saying earlier, which is at this point, one can perhaps repackage statements that are made in the ALJ's treatment in a way that is made to answer other things. But the question is whether what we're reviewing does the answering already. It does, Your Honor. And that's the tricky part of this case, because there may be a lot of data points in the voluminous stuff that's in here and everything that the ALJ put together and then what the commission ultimately ratified. But do they pointedly respond to the presentation that was made in a way that's consistent with our decisions and expectations of the commission? And so, for example, the sort of things that you're pointing to, it's not entirely clear to me that on the face of the ALJ's opinion, they're responsive in the way that you're now repackaging it as suggesting it would be. Well, Your Honor, the ALJ opinion, and together with the commission's affirming order, does not fully address all of the arguments as they were presented to the commission. Well, the anomaly argument was presented, no? Correct. So the commission says very little other than we affirm, and this is all relative. They say very little that I can find anyway. And the ALJ says some things, and I'm curious. The response on the remedy seems beside the point. That is, that they haven't come up with the right remedy. It seems to me if the commission agreed with the proposition on the anomaly, there would be no answer to say your remedy is not a really good choice. They've got to say something better than that. So I take that out. Where is the answer on the anomaly? Where do you think the best answer is other than that one sentence, which even though I can tease something out of it, is that really? Do you want to rely on Edwards' teasing things out of it or the commission's explanation? Your Honor, we'd be pleased to rely on that. Yeah, I'm sure you would. There have been other cases when you haven't been so pleased. Your Honor, in addition to that sentence, they – well, first let me back up. Of course, the court may affirm on the basis of the reasoning appearing in the ALJ opinion, that's the cities of Bethany. No, I'm assuming that, but I'm trying to figure out what you think is a quality explanation there. Right. Well, so in addition to that – Apart from this remedy. Forget the remedy. Understood. Okay. So in addition to that single sentence appearing, I mean there is also a footnote that on JA 451, which goes to the fact that Petra Star – well, Petra Star didn't offer any witnesses in the record, but Petra Star did not offer any evidence that simple distillation actually adds value, and if so, how much. And moreover, the record indicates that there are no simple distillation refineries on the West Coast. This is what the ALJ noted at footnote 71 at JA 451. And in fact, Flint Hills' witness conceded that there is no one out there who's operating a refinery that looks like the quality bank model refinery. And he acknowledges that no one's out there doing it. No one's just taking Alaska crude and distilling it through a distillation tower and then selling what comes out. And he moreover acknowledges that you probably couldn't earn money operating a refinery that way. And that appears at Mr. Verlager's transcript testimony, page 360, JA 346. So that is an explanation. We have to recall that simple distillation is the very first step in the refining process, and what comes out of the simple distillation tower are these intermediate products. Refiners typically do a lot more to these products before they can actually be sold as regular gasoline, premium gasoline, asphalt, fuel oils. That's the real value added. The value added is what happens downstream of the distillation tower. So there may be other responses, but it at least puts into play the footnote earlier in the ALJ's opinion that was referenced by your colleague about intermediate values. Yes. And what's your response to that? Because I think the point that was being made was that the statements, the sentence here, which I think probably encompasses the footnote you're referring to, can't be squared with the earlier footnote. Oh, I'm sorry. Your Honor is saying that it can't be squared with the footnote. The footnote that started, I've now lost, oh, it's footnote 21. It is assumed that the, on JA 396, it is assumed that the public market prices for each of these six cuts includes the simple refining distillation cost of producing the cut. Right. I mean, that's just an assumption appearing in the order. I mean, there's actually no evidence that was put into the record about the actual cost of distillation or whether distillation even adds any value. I mean, it is solely the initial step at a refinery, and the record evidence indicates that this isn't what's really profitable at a refinery. It is a conceptual point that's being made. I mean, I think the point that's being made is if you understand theoretically the way this works, this should always be the case. And if this doesn't happen, there's got to be some kind of answer. That's an anomaly. And is the commission contesting that it should work the way the petitioner said? Yes. Well, the commission that petitioned. I'm sorry. I don't mean to interrupt you, but I want to tell you what my full question is. And if they're really contesting it, I know the ALJ made some strong statement on it. It's that wrong or whatever. So then I'm looking for an explanation. How do you explain what the commission is suggesting? The commission is essentially saying there's some variabilities which might cause this so-called anomaly. And how do they explain that? What are the variabilities? And how do they know they're variabilities? What do I look to to know that that's right? Well, the opinion explains that, first of all, the Quality Bank is not designed to generate actual market values. It's designed to generate relative values. But that just seems to fly in the face of the commission's own theory all along. Oh, yeah, that certainly does. That has been. You didn't have to do that. But it seems like the position all along is this is supposed to replicate market conditions. And, yes, with respect to at least these three cuts, there's not a real functioning market. So we have to come at it in a different way and try to approximate what would be a market. But the goal is to try to replicate what a market would do. And, yes, it's not to the exclusion of a relative component because under our decisions, there's got to be relative consistency. But you didn't have to own up to creating the functional equivalent or reasonable facsimile of a market. But it seems like that bridge has been crossed and that's the world that you're operating in. Well, Your Honor, I think not exactly. The commission is really not trying to approximate precise market values here. And going back to Paragraph 136, the commission is the Quality Bank is not designed to assess all of the products that come out of processing a barrel of crude. It's just using its legal fiction. It uses the distillation tower as a model for a hypothetical, extraordinarily simplified refinery to generate some market prices that could be used to compare. To generate market prices. Well, in some cases to generate a synthetic market price, not an actual market price. So it comes back to the fact that this is not a meaningful comparison. It's, you know, again, simple distillation is not truly profitable. And going back to the original premise, the most direct evidence on why it's appropriate for the calculation to include capital investments is that refiners are earning profits. Refiners are profit-seeking entities. They're not sinking hundreds of millions of dollars into the ground and walking away. And that's fully borne out by the entire record that was before the ALJ and as summarized by the ALJ and the commission's findings. That's a slightly separate. I realize these are connected. But the preceding question, which really underlines their argument, is how can you have this anomaly? What explains it? And you've been very hesitant. You have used the reference to market prices. That's the commission's choice. And with respect to the certain cuts, the commission believes there are market prices to be found. And then with respect to three, you come up with they come up with it as best they can. So with propane and normal butane and light straight run, et cetera, there are prices. And you take it. Are you saying that the commission is saying there's some variability in that that we really can't explain? I don't think so, Your Honor. How can you have the anomaly is what they're asking. You're the one who said we're going to use market prices. And with respect to six of them, I thought the premise is, my colleague has said, you've always assumed there are market prices that are for real. Now, I could understand you're saying, yeah, someone else creates those market prices. We'll accept them. And I thought this was part of what the ALJ was saying. But there's some variability in there, and sometimes it shows up more rather than less. I'm not getting it now. What are you saying? Well, Your Honor, it's certainly possible. I mean, the ALJ said that, at best, this was a temporary anomaly. I mean, certainly market conditions in 2009 through 2012 in the aftermath of the recession were anomalous. But it isn't necessary to, and it's not appropriate to try to sum up all of these distillation cuts. They're just not designed to be an absolute measure of market value. And actually, significantly, the ALJ also indicated at paragraph 138, J.A. 453, that Petrostar offered no relative valuation evidence that suggested that a quality bank was assigning inaccurate relative valuations among the different distillation cuts. Specifically, the evidence submitted by other parties indicates that Resid's relative valuation actually remained stable by comparison with the other quality bank cuts throughout the 2004 to 2013 time period. This is footnote 74 at J.A. 453. The ALJ cites various parties' witnesses on the issue of relative valuation. I'm not sure I follow that, because I thought their point all along has been that Resid is just misvalued. Correct. But as the ALJ was indicating, what matters here is relative valuation. Is Resid misvalued by comparison with the other cuts? And so in this particular footnote, the ALJ says that actually the evidence indicates that Resid's valuation has remained constant. So it just suggests that— Well, vis-à-vis the others. But I think the point is, as I understood the argument and as I understood what the commission would have been expected to respond to, is that these are supposed to be as accurate as possible. Resid has been just inaccurate because there's an embedded problem with the formula. Now, there may well be a response to that. I get that. I think their point, though, is not necessarily there's not a response to it. It's just that whatever the response is, I don't know what it is. And then to come back and say, well, relatively it's been constant, it doesn't answer whether, as an absolute matter, the value is just wrong. Right. Well, Your Honor, just to back up a little bit, what's not at issue here is the specific level of the Resid valuation, in the sense that Petrostar is arguing that the entire Coker capital cost factor needs to be removed. It needs to be permanently eliminated from the formula. Because it renders the price for Resid inaccurate. It just renders it wrong. Right. So what's not at issue, though, is the level of capital recovery costs, and it's just whether, as a conceptual matter, this factor belongs in the equation or not. At all. Right. And I think the evidence overwhelmingly demonstrates that it is appropriate to include it because refiners are, in fact, earning profits, and these profits are allowing them to recover their capital investments, which is conceded by the primary witness relied upon by Petrostar. Okay.  The petition should be denied. Mr. Vendernagel. Thank you, Your Honor. Jim Vendernagel, Sidley & Austin, and I'm appearing on behalf of the interveners in support of the appellee. Let me start where everybody's left off, which is paragraph 136. And I'd like you to look at 137 first because there's a sentence that bears on this. In the middle, the judge is sort of, the ALJ is sort of repeating his finding, and he makes the statement, the two have no meaningful connection for quality bank purposes, and what he's talking about that is the composite value of the nine cuts and the price of ANS. And that takes you directly to the last sentence that Judge Edwards focused on, which is the value of ANS in the marketplace is driven not by what comes off the distillation tower, but what comes out of the refinery in total. That's what's being discussed in the reference to CPA 1, 16 to 19. It was our expert's testimony. Just to have some understanding of the architecture of this, as I understood paragraph 137, that's making the relative versus absolute point. No, I think he's transitioning to the relative to absolute. The relative is talked about more extensively in paragraph 138. I think the sentence I'm focusing on he's referencing back, as he says, as previously demonstrated. Just immediately above the portion you were talking about, 137 says, Oxy confirms that QB methodology's objective is to assign accurate relative values italicized among the various quality bank cuts. The methodology's objective is not to determine the, again, As I read everything that followed, it was by reference to the asserted distinction that was being made between relative and absolute. Yeah, but we're missing a key distinction here between relative value, actual value, and the price of ANS. There is no evidence in the record, and the evidence in the record that does exist, says there's no meaningful connection between the values created from distillation and the value of ANS. This proposition that they have, that you necessarily add value simply by making the first step in the refining process, isn't true. And secondly, it hasn't been proved. There's extensive testimony in the joint appendix where our experts explain why Mr. Verlager's concept that you could derive, you could essentially back into the net product value of ANS off of the nine composite cuts was wrong. That's at JA 161 to 167, and at Mr. Keeley's testimony, it's at JA 286 to 293. And what they're basically saying is essentially what Judge Edwards focused on, and that is that the value of ANS, what refiners are willing to pay somebody to buy the ANS, is driven by what they can produce after distillation, not before distillation. So the price of ANS is related to what comes out of the total refinery, not what comes off of the distillation process. It's not hard to imagine that the first step in a manufacturing process does not add value that has recognizable market value. And where would you point us as for the basis on which to conclude that that's the rationale on which the ALJ and other commissioners- Well, that's what the ALJ is saying in this sentence at the end of paragraph 136. The two sentences- So we're back to the sentences that we were talking about earlier. Oh, absolutely. That is the core of the response, but it isn't-well, I can't understand it. What he's basically saying is the methodology prices everything at the distillation tower. So you've got to get the prices at the distillation tower. We have six prices at the distillation tower for that purpose, and now we have three other products that don't have prices. So we have to look further downstream, come up with a price, and then back into a price at the distillation tower. And to do that, you've got to take out all the costs. Otherwise, and this comes right out of Oxy, you're going to overvalue those cuts because you're essentially leaving in the costs that created the more valuable products downstream. And what he's basically saying is that's where the value is being added in the refining process, and that as a consequence, there's no meaningful connection between the ANS price and these prices that are supposed to be actual prices. Just because they're two actual prices doesn't establish that they're related. What they're essentially saying is there's no connection here. So whether there's an anomaly, it's not meaningful. Yeah, I mean, I think the question, just to tell you what I'm thinking, I think the question is whether this kind of explanation is what the ALJ is saying. Well, one other factor to take into account in this connection is footnote 72. What is he saying? Why is this footnote here at this juncture? Now, in paragraph 106, the judge goes on and on about the fact you've got to back out these costs in doing the quality bank. And he says, he repeats that here and then says, Mr. Verlager reaffirmed a misunderstanding at this point throughout the proceeding. And if you look at the reference, FR 51 at 7 and 8, and that's at JA 233 and 38, the reality is he is not valuing all the cuts at the distillation tower. The major problem the judge had with Mr. Verlager is he was valuing these cuts when they came off the different portions of the hypothetical construct. And he's essentially valuing the coca products as if they came off the coca as opposed to the distillation tower. The whole back out concept is whatever costs are incurred downstream got to come out. The evidence in this case is overwhelming that coking refineries make money. So coking is profitable. So you've got to take capital costs out. And then you back into for the resid price, a resid price at the coker. And in answer to the question, well, how's that consistent with footnote 21? It's absolutely consistent with footnote 21. The methodology assumes that whatever costs are incurred in distillation are recovered in those prices. So for the six cuts, well, it's in there. With respect to this, since we're only backing out costs related to the downstream processing, the resulting price has whatever costs of distillation are in it. So it's perfectly consistent in that regard. And the final point that I'd make on this is this argument that spot prices don't include capital costs is just wrong. I mean, for two reasons. One is if you look at JA352, Mr. Verlager admits that they do. He was asked the question, as we sit here today, that the market prices that are used by the West Coast refineries include the recovery of capital fixed and variable costs, the full component. Yes, they include the recovery of capital and full costs as they were incurred and as they are measured. So this argument that spot prices don't include capital costs is just wrong. And you can tell that from the Platts netback analysis. Platts only uses spot prices. And in its netback analysis, what it's doing is trying to figure out. Again, as to that, too, I think the question is not, at the end of the day, whether there's an answer. Because, I mean, I think the seeds of an answer are there, and you're elucidating them. The question is whether the commission and beforehand the ALJ gave the answer. Oh, and I think they did. And look, the real answer, the best part of the answer in this thing is if you look at paragraphs 119 and 120, where the court talks about the conceptual underpinnings of the quality bank as it relates to capital costs. He says, from a conceptual standpoint, you can't assume the COCR and not assume the costs. He then goes on to say, but that doesn't mean there's a guaranteed return. And he talks about the concepts of stranded costs and sunk costs, which are really two sides of the same coin for these purposes. And then he says the proof is in the pudding. What is going on in the real world? And if you go over to paragraph 143 and 144 in his decision, he then picks up at the end of 143 by saying, now we've got to revisit the sunk cost theory and see what's going on. And then in 144, he lays out his conclusion that in the real world, these costs are being incurred, that they haven't lost their value, and that as a consequence, that capital cost factor has to be in there. He doesn't say it has to be in there at 20%. He goes out of his way to say, look, 20% may be the wrong number, but that wasn't the issue that was presented. The issue that was presented is, should capital costs be excluded? And the answer to that is clearly no. Thank you. Thank you. Mr. Citron, we'll give you two minutes. Sure. I think this argument has become a little bit of a Rorschach test for that sentence, paragraph 136, with lots of people reading it differently, and I think that that tells you mostly what you need to know, which is that it's not entirely clear exactly what the ALJ meant by it. And I think that's most obvious because Firk's attorney here, even with the benefit of post hoc hindsight, won't exactly tell you what parts of that reasoning they endorse or why. I will tell you what I think is going on in paragraph 136, and I think that it actually strengthens our argument, but my main point is this is a rational explanation challenge, not a substantial evidence challenge. So it's not actually, as Judge Srinivasan was pointing out, the question is not whether there's some evidence in the record that might be used to formulate an answer, but whether the answer is there. What they seem to be saying in paragraph 136 is, look, the real world value of a barrel of oil is going to be higher because there's a bunch of awesome stuff that we can make out of it at the end of the day. We already have that in place. If that's true, it will make the anomaly worse, because it means that out of light distillate, heavy distillate, and resid, you can make a lot of extremely valuable things that should be reflected in the value of those cuts too. I think it's an awfully pleasant coincidence that their theory is that will somehow raise the value of the underlying barrel, but not the intermediate products that you could then use to make all that stuff. Everybody agrees the first step in the refining process is distillation, unless the distillation products are in fact more valuable than the underlying raw crude, which is, I think, agreed that they are more valuable, that the costs are reflected in those intermediate cuts. What you would see refiners do is go out into the real world and buy resid, or buy light distillate, or buy propane, and use it to make this stuff, because it's cheaper. But that never happened because it was just an accounting error. It's just the way the quality bank is misdesigned. It's not a real-world feature. If they think that this unusual thing is happening, they need to explain that. With respect to your Tesoro argument, you may have seen more than one explanation offered. I'm not sure, but you may have seen more than one explanation offered. But from your perspective, we have to decide whether there's enough of an explanation in there already. If what has been argued in opposition to you had been in the ALJ's opinion, I take it you wouldn't have a Tesoro argument. Then I would have to fall back on either the absence of substantial evidence or the fundamental irrationality of that. I think I'm very happy to agree that that's where the deference to the agency lies. But this is just what Judge Edward's decision in Bluewater and Judge Garland's decision in Torres says. The reason we require an explanation with specificity more than we see in paragraph 136, which I think results in disagreement among the lawyers about what that sentence means, is precisely because once we get a good explanation or a clear explanation of what the agency thinks, we will defer to its technical judgments about it. But that's just why we need to know exactly what they think, and I don't think we do. Thank you. Thank you, counsel. The case is submitted.
judges: Tatel, Srinivasan, Edwards